*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* R. BROCK, Minor.

UNPUBLISHED
July 08, 2025
1:58 PM

No. 373691
Midland Circuit Court
Family Division
LC No. 16-004678-NA

Before: O'BRIEN, P.J., and M. J. KELLY and KOROBKIN, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court's order terminating her parental rights to the minor child, RB, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent). Finding no clear error under two of these four statutory grounds, we affirm.

## I. BACKGROUND AND FACTS

In December 2023, Children's Protective Services (CPS) received a complaint that respondent was living in a van or hotel room with one-year-old RB; that she used methamphetamine in the presence of RB; and that she "frequently smack[ed]" RB in the face and body, leaving a bruise on one occasion. Upon meeting respondent later that day, a CPS investigator noted that she appeared to be under the influence of substances. Respondent refused to take a drug screen and admitted to the investigator that she used methamphetamine two days before. Several days later, she refused to provide her and RB's location to CPS and advised the CPS investigator that she would no longer communicate with the agency, meet with CPS staff, or participate in any services. The Department of Health and Human Services (DHHS) filed a petition to remove RB from her mother's custody, alleging that respondent physically neglected RB, that she abused substances, and that she placed RB at an unreasonable risk of harm. The trial court granted an ex parte order for RB's removal, after which it held a preliminary hearing, authorized the DHHS's petition, and ordered RB to remain in the care and custody of the DHHS.

At the adjudication hearing in March 2024, respondent entered a plea admitting to allegations that she was homeless at the time of the petition, that she used methamphetamines two

-1-

days before CPS received the December 2023 complaint, that she told CPS that "using meth [was] different for her" and that she felt "like she [sic] meant to be on meth," and that she refused to allow CPS to conduct a home study of the hotel room in which she was previously living.[1]  The trial court found that her plea was made "made knowingly, understandingly, and voluntarily."  The foster care caseworker identified respondent's barriers to reunification as parenting skills, mental health, unemployment, housing, and substance abuse.  A case service plan was put in place.

In October 2024, the DHHS filed a supplemental petition for termination of respondent's parental rights.  At the termination hearing, the trial court heard testimony about respondent's lack of participation and progress throughout the proceedings and the likelihood of harm to RB if she were returned to respondent's custody.  Following the hearing, the trial court issued an opinion and order terminating respondent's parental rights to RB under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).  This appeal followed.

## II.  STANDARDS OF REVIEW

"A court may terminate a respondent's parental rights if one or more of the statutory grounds for termination listed in MCL 712A.19b(3) have been proven by clear and convincing evidence."  *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012).  Once a statutory ground for termination is established, the trial court must then determine whether termination is in the child's best interests.  *Id.*  "Best interests are determined on the basis of the preponderance of the evidence."  *In re LaFrance*, 306 Mich App 713, 733; 858 NW2d 143 (2014).

"We review for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and . . . the court's decision regarding the child's best interest."  *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000).  "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses."  *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013) (quotation marks and citation omitted).

## III.  ANALYSIS

## A.  STATUTORY GROUNDS

Respondent contends that the trial court clearly erred by finding statutory grounds for termination of her parental rights.  We disagree.

## 1.  CONDITIONS CONTINUE TO EXIST

For termination to be proper under MCL 712A.19b(3)(c)(*i*), (1) 182 or more days must have elapsed since the initial dispositional order, (2) the conditions leading to adjudication must continue to exist, and (3) there must be "no reasonable likelihood that the conditions will be

---

[1] Respondent was incarcerated at the time of the adjudication hearing.

rectified within a reasonable time considering the child's age." All three requirements are present here.

First, the initial disposition order was filed on April 1, 2024, and the termination trial began on November 8, 2024—221 days later. Therefore, "182 or more days" had "elapsed since the issuance of an initial dispositional order." MCL 712A.19b(3)(c)(*i*).

Second, the trial court did not clearly err by finding that the conditions leading to adjudication—identified as parenting skills, mental health, unemployment, housing insecurity, and substance abuse—continued to exist. Regarding parenting skills, respondent completed parenting handouts while incarcerated; however, the foster care caseworker testified that respondent was not compliant with "baby court," parenting classes, or parenting education. Concerning housing insecurity and unemployment, the record reflects that respondent never provided proof of employment (although she reported to the caseworker multiple times that she was employed), that she never obtained stable housing, and that she did not participate in the services offered to help her rectify these barriers for the pendency of the case.

As for respondent's mental health, the trial court required that respondent follow the recommendations in her psychological evaluation, that she work with a program known as "infant mental health" (IMH) and obtain an individual counselor, that she take all medications as prescribed, and that she attend all her mental health appointments. The record reflects that respondent did not follow the recommendations in her psychological evaluation, including to participate in inpatient mental health treatment, stating that she believed that she was misdiagnosed. Respondent also testified that, between May 2024 and September 2024 before her incarceration, she did not obtain any mental health treatment—with IMH or otherwise—explaining that she was "on a waiting list . . . because [respondent was] picky about [her] therapist," who "got to believe in God and believe anything's possible to believe [respondent's] story." Additionally, respondent did not demonstrate any benefit from the services that she may have complied with because, during the termination hearing, respondent seemed to have the same delusions that concerned the psychologist at the evaluation. For example, respondent testified that RB crawled 350 laps down the hotel hallway when CPS arrived in December 2023, that respondent had "abilities" and predicted her own future since she was three years old, that RB was her mother reincarnated, and that someone offered her "twenty grand" for RB.

The record also amply supports the trial court's findings that respondent did not rectify the condition of substance abuse. By the commencement of the termination hearing in November 2024, respondent had not participated in any substance abuse treatment despite being offered inpatient treatment, outpatient treatment, and drug screening since the case's inception in December 2023. Respondent missed 20 to 25 drug screens and the only two completed screens were positive: one for methamphetamine and amphetamine and the second for tetrahydrocannabinol (THC). Further, the trial court heard testimony that as recently as September 2024, respondent told the foster care caseworker about her belief that methamphetamine was "good for her brain." Also, at the time of the termination hearing, respondent had a pending charge for possession of methamphetamine. Overall, "the totality of the evidence" demonstrated that respondent had not accomplished any "meaningful change in the conditions" that led to adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

The third requirement for termination under MCL 712A.19b(3)(c)(*i*) is that "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." The determination of what constitutes a reasonable time for the conditions to be rectified includes both how long it will take for the parent to improve conditions and how long the children can wait for the parent's improvement. *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). This Court has stated that the Legislature did not intend children to be left in foster care indefinitely. *Id*. at 647.

In this case, at the time of trial, RB had been removed from respondent's care and placed in foster care for almost a year—approximately half of her life. The psychologist who conducted respondent's psychological evaluation testified that respondent could not safely parent or provide proper care and custody of RB within a reasonable time because of the severity of respondent's condition at the time of the evaluation in January 2024. The psychologist explained that "[t]hings were so unstable and she had no insight that she needed help at all" that "it was clear to me it was not going to happen in a—a reasonable or fair amount of time." The trial court heard testimony from the CPS investigator at the preliminary hearing in December 2023 that a main concern of his was "the lack of stability for [RB] in [respondent's] care." Likewise, at termination in November 2024, the caseworker testified that RB was still "not receiving" stability and permanency, which adoption would provide, while waiting for respondent to benefit from her services.

Respondent argues that because "she was able to make progress toward the conditions that led to adjudication" in a previous case between 2016 and 2018, "there was no reason to believe that the same barriers to reunification in this case could not be rectified within a reasonable time considering the child's age." As it does not appear that respondent raised this point of comparison before the trial court, it is difficult to see how it could form the basis for concluding that the trial court committed clear error in finding no reasonable likelihood that the conditions at issue would be rectified within a reasonable time. Regardless, respondent does not contend that the conditions or circumstances of the previous case were similar nor that she was taking similar actions toward rectifying them; she merely asserts facts from the previous case and states that she could make progress in this case because she did it before. The record, though, does not support respondent's argument. Whatever respondent's progress may have been in her previous case, respondent's actions in the present case came nowhere close to demonstrating that she could rectify the conditions leading to adjudication. To the contrary, there simply were no signs of improvement in the reasonably foreseeable future. Therefore, the trial court did not clearly err by finding that respondent would be unable to rectify the conditions that led to adjudication within a reasonable time considering RB's age.

2. REASONABLE LIKELIHOOD THAT CHILD WILL BE HARMED

Under MCL 712A.19b(3)(j), termination of parental rights is proper when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Harm under MCL 712A.19b(3)(j) includes both emotional and physical harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). Termination is appropriate under MCL 712A.19b(3)(j) when a respondent's "own behaviors were directly harming the children or exposing them to harm." *In re Plump*, 294 Mich App at 273. Moreover, "a parent's failure to comply with the terms and conditions of [their]

service plan is evidence that the child will be harmed if returned to the parent's home." *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

The trial court did not clearly err by finding that this statutory ground was satisfied. Respondent's substance use around RB continued to be a concern at trial in November 2024 because the record demonstrates that respondent continued to struggle with substance abuse: she was facing possession of methamphetamine charges at that time and stated that methamphetamine was "good for her brain" as recently as September 2024. The trial court also heard testimony that respondent believed that it was appropriate for her to use methamphetamines in the home with RB in another room. Additionally, the psychologist who performed respondent's evaluation testified that if respondent had not completed the recommendations from the evaluation, then reunification would be "very unsafe" for RB. The psychologist further explained that respondent had delusions that RB was an adult and told respondent "to do things that might not be safe for [RB]," including previously feeding her solid food as a one-month-old. Additionally, the psychologist testified that respondent admitted to leaving RB alone with a convicted sex offender of a child under the age of 13 "because she felt a good vibe from him," stemming from her self-proclaimed "super natural powers," ability to predict "if somebody was going to offend against her daughter.". Given that, as previously discussed, respondent failed to follow the conditions of her case service plan to rectify her mental health and substance abuse barriers and that her behavior contributed to placing RB at risk of harm, the trial court did not clearly err in finding that it was reasonably likely that RB would experience emotional or physical harm if returned to respondent's care. See *In re White*, 303 Mich App at 711.

Respondent's arguments to the contrary are unavailing. Respondent contends that substance abuse was a barrier to reunification in her previous child protective case in which the child was returned to her care and that, similarly, in this case, she acted to rectify the barrier by screening negative for substances and registering for an inpatient substance abuse treatment program that began after trial. However, the caseworker testified that the DHHS could not consider the negative screens because the tests were not randomly administered; they were conducted as part of her pretrial services for her pending criminal charges at medical appointments for which respondent had at least 72 hours of notice. Further, the two random drug screens that respondent completed as part of her case service plan in this case were positive for methamphetamines and amphetamines, and THC, respectively. Concerning the treatment program, respondent admitted that she waited until her September 2024 incarceration to register even though the caseworker testified that respondent was guaranteed to attend a similar treatment program previously that year in April 2024, which was required by her initial case service plan. Moreover, respondent was noncompliant with that service because she did not call to arrange her attendance within the requisite timeframe. On this record, the trial court did not clearly err in finding that respondent's continuing substance abuse presented a reasonable likelihood of harm to RB.

Respondent also highlights that, despite the caseworker's testimony that allegations of physical abuse contributed to RB's emergency removal, the record is absent of testimony of specific instances of alleged physical abuse of RB by respondent. However, this statutory ground encompasses more than actual physical harm. Again, the record amply supports that respondent placed RB at the risk of both physical and emotional harm. See *In re Hudson*, 294 Mich App at 268.

-5-

### 3. OTHER STATUTORY GROUNDS

In addition to MCL 712A.19b(3)(c)(*i*) and (j), the trial court found statutory grounds to terminate under MCL 712A.19b(3)(c)(*ii*) (failure to rectify other conditions) and MCL 712A.19b(3)(g) (failure to provide proper care and custody). Respondent challenges these findings as well. However, "[o]nly one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Therefore, having concluded that the trial court did not clearly err by finding two statutory grounds for termination, we opt not to address the additional grounds upon which the trial court based its decision. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

### B. BEST INTERESTS

Respondent also contends that the trial court clearly erred by finding that termination of respondent's parental rights was in RB's best interests. We disagree.

"The focus at the best-interest stage has always been on the child, not the parent." *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022). "In making its best-interest determination, the trial court may consider the whole record . . . ." *In re Medina*, 317 Mich App at 237 (quotation marks omitted). The court may consider factors including "the child's bond to the parent[;] the parent's parenting ability[;] the child's need for permanency, stability, and finality[;] and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714. We also consider the length of time that the child has been removed from a parent and whether it was likely "that the child could be returned to [his or] her parents' home within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 249; 824 NW2d 569 (2012).

Respondent again argues that the trial court did not give proper weight to her progress toward reunification in the previous case involving another child in 2016. However, respondent continued to struggle with substance abuse in this case, despite apparently overcoming this barrier in the previous case, and she clearly did not comply with her current case service plan to the same extent as the previous one. The trial court did not clearly error in determining that respondent would be unable to provide a safe home for RB within a reasonable period of time, and that terminating her parental rights to provide permanency and stability for RB was in RB's best interests.

Next, respondent argues that the trial court clearly erred by finding that "no appreciable, healthy bond" existed between her and RB. We disagree. Respondent did not have any parenting time visits with RB for nearly a year during the entire pendency of the case. Following the preliminary hearing in December 2023, the trial court ordered supervised parenting time at the discretion of the DHHS contingent upon continued proof of her sobriety and engagement with the DHHS. By adjudication in March 2024, respondent did not provide proof of her sobriety or engage with the DHHS to start parenting time visits. After adjudication, the trial court suspended respondent's parenting time altogether, finding that exercise of her parenting time, "even if

supervised, may be harmful to [RB]." Respondent's parenting time remained suspended through termination because of her continued noncompliance with her substance abuse services.

Finally, respondent argues that, contrary to the findings of the trial court, RB did not have "an immediate need for finality" and that, therefore, the trial court could have afforded her additional time to complete services. Again, we disagree that the trial court committed clear error in finding otherwise. The caseworker testified that adoption provided RB the opportunity for stability and permanency, which she did not have while awaiting respondent's efforts to rectify the various barriers to reunification for approximately half of her life. Further, respondent minimally complied with her case service plan for the pendency of the case to the point that she was never able to satisfy the court's conditions of supervised visitation, and the caseworker testified that respondent did not "complete[] the necessary services to reduce any barriers" leading to adjudication.

We therefore conclude that the trial court did not clearly err in finding that termination of respondent's parental rights was in RB's best interests. RB was one year old at the time of removal and spent the next 11 months in foster care with no visitation from respondent. The trial court found that respondent could not "provide a safe home for [RB] within any sort of reasonable time." The record further supports that RB was thriving in her preadoptive foster placement. Because of RB's young age, her need for permanence and stability, and her "strong bond with her caregivers," the trial court permissibly determined that it was in RB's best interests to terminate respondent's parental rights.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Michael J. Kelly
/s/ Daniel S. Korobkin